UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JULIE A. JANAS,                                                    **REPORT**
                                                                            **and**
                                        Plaintiff,            **RECOMMENDATION**

                v.
                                                                  **02-CV-912A(F)**
JoANNE B. BARNHART,

                                        Defendant.

_____

APPEARANCES:            PUSATIER, SHERMAN, ABBOTT & SUGARMAN
                                Attorneys for Plaintiff
                                RICHARD G. ABBOTT, of Counsel
                                2464 Elmwood Avenue
                                Kenmore, New York 14217

                                TERRANCE P. FLYNN
                                United States Attorney
                                Attorney for Defendant
                                JANE B. WOLFE and
                                KEVIN D. ROBINSON
                                Assistant United States Attorneys, of Counsel
                                Federal Centre
                                138 Delaware Avenue
                                Buffalo, New York 14202

## JURISDICTION

        This action was referred to the undersigned by Honorable Richard J. Arcara on

May 16, 2003.  The matter is presently before the court on Defendant's motion for

judgment on the pleadings filed October 14, 2003 (Doc. No. 9).

## BACKGROUND

        Plaintiff Julie A. Janas seeks review of the Commissioner's decision denying her

Social Security Disability Insurance ("SSDI") benefits under Title II of the Social Security

Act ("the Act"), for the period from May 1, 1999 to March 1, 2001 ("the closed period").

In denying Plaintiff's application for benefits, the Commissioner determined that

although Plaintiff had not engaged in substantial gainful activity during the closed period

for which Plaintiff alleges she was disabled by post-status right kidney removal, urinary

tract infections ("UTIs"), chronic flank pain, appendectomy, depression and other urinary

problems requiring a stent and catheterization, Plaintiff did not have an impairment or

combination of impairments within the Act's definition of impairment.  (R. 15, 23-25).[1]

The Commissioner further determined that Plaintiff's allegations regarding her

limitations during the closed period, to which Plaintiff and her father testified at the

hearing, are not fully credible.  (R. 24).  The Commissioner found that during the closed

period, Plaintiff retained the residual functional capacity for the full range of light work,

with the exception of work involving more than occasional crouching and stooping or

exposing Plaintiff to extreme cold.  (R. 22, 24).  As such, Plaintiff was found not

disabled, as defined in the Act, at any time during the close period.  (R. 25).


## PROCEDURAL HISTORY

Plaintiff filed an application disability benefits on March 30, 2000, alleging that

since December 31, 1998, she had been disabled by a congenital kidney defect, severe

pain, a urinary tract disorder and depression.  (R. 102-04, 173-98).  Plaintiff later

amended the alleged disability dates to the closed period of March 1, 1999 through

March 1, 2001.  (R. 31, 33).  The application was initially denied on June 28, 2000 (R.

---

[1] "R." references are to the page numbers of the administrative record submitted in this case.

59-62), and, upon reconsideration, on September 26, 2000. (R. 66-68). On October 3, 2000, Plaintiff filed a request for an administrative hearing before an Administrative Law Judge ("ALJ") with the SSA. (R. 69-70). On September 17, 2001, an administrative hearing was held before ALJ Nancy Lee Gregg ("ALJ Gregg" or "the ALJ"), at which time Plaintiff, represented by Richard G. Abbott, Esq. ("Mr. Abbott" or "Abbott"), appeared and testified. (R. 31-51). Testimony was also given by Plaintiff's father, Carl Franklin Janas ("Mr. Janas"). (R. 51-55). In a decision dated January 18, 2002 ("the Hearing Decision"), the ALJ found Plaintiff was not disabled. (R. 11-25). The ALJ also determined that although Plaintiff continued to work part-time between March 1, 1999 and March 1, 2001, the period for which she seeks benefits, her earnings for the period of time did not exceed the threshold for eligibility for disability benefits, with the exception of March and April 1999. (R. 17).

On February 25, 2002, Plaintiff requested review of the hearing decision by the Appeals Council. (R. 9-10). On October 11, 2002, the Appeals Council acknowledged receipt of additional information submitted by Plaintiff In connection with the requested hearing decision review (R. 8) and, upon considering Plaintiff's request for review of the ALJ's hearing decision and the record, including the newly submitted evidence, denied the request for review, (R. 6-7), thereby rendering the ALJ's hearing decision the final decision of the Commissioner. This action followed on December 17, 2002.[2]

---

[2] A court action challenging the Commissioner's final decision is required to be brought within 60 days after notice of such final decision is received. 42 U.S.C. § 405(g); 20 C.F.R. § 422.210(c). Further, the date of receipt of notice of the Commissioner's final decision "shall be presumed to be 5 days after the date of such notice, unless there is a reasonable showing to the contrary." 20 C.F.R. § 422.210(c). "Because the 60-day time limit defines that terms on which the United States waives its sovereign immunity and consents to be sued, it is strictly construed." *Bowen v. City of New York*, 476 U.S. 467, 479 (1986). Nevertheless, the 60-day period "is not jurisdictional, but rather constitutes a period of limitations,"

By order filed March 19, 2003 (Doc. No. 4), May 19, 2003 was established as the deadline by which Defendant was to file her answer.  Defendant's answer to the Complaint, filed on May 14, 2003 (Doc. No. 5), was accompanied by the attached record of the administrative proceedings.  On July 31, 2003, Defendant filed a Supplement to the Answer (Doc. No. 8), to which was attached several pages missing from the record of the administrative proceedings filed on May 14, 2003.  On October 14, 2003, Defendant filed a motion for judgment on the pleadings (Doc. No. 9) and a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 10) ("Defendant's Memorandum").  On December 30, 2003, Plaintiff filed Plaintiff's Memorandum of Law in Opposition to the Commissioner's [Motion for] Judgment on the Pleadings and in Support of the Plaintiff's Cross-Motion for Judgment on the Pleadings[3] (Doc. No. 12) ("Plaintiff's Memorandum").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for judgment on the pleadings should be DENIED and the matter remanded for calculation of benefits.

---

*Bowen*, *supra*, at 478, and was intended by Congress to be "'unusually protective' of claimants."  *Id.* at 478.  As such, the 60-day limitations period is waivable by the parties.  *Weinberger v. Salfi*, 422 U.S. 749, 763-64 (1975).  The instant action was commenced 62 days after Plaintiff's presumed receipt of the Commissioner's final decision and is, thus, untimely.  Defendant, however, neither asserts in the answer that the action is barred by the statute of limitations, nor raises it in connection with Defendant's motion for judgment on the pleadings.  As such, Defendant has waived the otherwise available statute of limitations defense, and the court may not consider it.  *See Davis v. Bryan*, 810 F.2d 42, 44-45 (2d Cir. 1987) (statute of limitations is an affirmative defense that is waived if not promptly pleaded and, absent extraordinary circumstances, should not be raised by the court *sua sponte*).

[3] Despite the document's title, the record contains no notice of cross-motion for judgment on the pleadings filed by Plaintiff.  As such, the court construes the document only as a response in opposition to Defendant's motion for judgment on the pleadings.

**FACTS**[4]

Plaintiff Julie A. Janas ("Plaintiff"), was born on October 25, 1977 and was 24 years old as of the date of the hearing before the ALJ. (R. 26, 32, 102). During the closed period, Plaintiff, who had never been married and had no children, lived with her parents. (R. 32). Plaintiff graduated from high school, but received no further education. (R. 32). Plaintiff's past relevant work experience included employment as a clerk at a video rental store and a children's indoor play center, and a book vendor. (R. 22, 35-38, 197, 217). Plaintiff's duties as a clerk included customer service, answering telephones, light cleaning, and operating the cash register. (R. 217). Plaintiff left her most recent clerk position at the video rental store because her employer would not grant Plaintiff's request for a leave of absence to recover from kidney surgery. (R. 197). As a book vendor, Plaintiff was required to drive to several stores where she straightened magazines and books for sale and placed new books on the display shelves. (R. 217). Plaintiff continued to work at the book vendor position during between March 1, 1999 and March 1, 2001, the period for which she had amended her disability benefits application, but was often assisted by her father who helped Plaintiff to lift heavy boxes of books and magazines.[5] (R. 36-37, 41, 197).

It is undisputed that Plaintiff was born with a urological defect, specifically, her

---

[4] Taken from the pleadings, administrative record and motion papers filed in this action.

[5] Plaintiff explained at the administrative hearing that as a book vendor, she worked only four hours a week, traveling to various home improvement stores in the area where she straightened the magazine and book displays. (R. 36-37). The ALJ found that despite Plaintiff's continued employment, her earnings during the closed period of March 1, 1999 and March 1, 2001, were under the threshold for disability benefits eligibility except as to March and April 1999. (R. 17). As such, Plaintiff currently seeks disability benefits for the closed period May 1, 1999 through March 1, 1999 ("the closed period"). Plaintiff's Memorandum at 1.

right kidney was lodged behind her bladder.  (R. 309).  During Plaintiff's senior year in high school, she experienced frequent UTIs and pain.  (R. 309).  On February 18, 1997, Plaintiff underwent a right nephrectomy, a surgical procedure to remove Plaintiff's right kidney which was infected.  (R. 504, 509, 608).  Following the surgery, Plaintiff continued to experience abdominal discomfort, UTIs and difficulty voiding cased by urethral stricture.[6]  (R. 265).  On April 20, 1999, Plaintiff underwent an internal urethrotomy cystoscopy, a surgical procedure in which an indwelling Foley catheter was inserted into Plaintiff's bladder to permit Plaintiff to perform self-catheterization when she was unable to void.  (R. 265, 267-68).  Following this cystoscopy, Plaintiff's complaints of pain and UTIs significantly increased.

On July 2, 1999, Plaintiff went to the emergency room at Millard Fillmore Hospital complaining of acute abdominal discomfort.  (R. 568).  An abdominal computerized tomography ("CT") scan performed on July 2, 1999 revealed no inflammation, (R. 458-59), and an upper gastrointestinal ("GI") X-ray series performed on July 6, 1999 was normal (R. 457).

On August 27, 1999, Plaintiff underwent a panendoscopy[7] with biopsy to evaluate Plaintiff's epigastric pain, nausea, weight loss and alternating constipation and diarrhea.  (R. 562-63).  Postendoscopy diagnosis was "rather severe diffuse gastritis," for which Prilosec was recommended pending receipt of the gastric biopsy results. (R.

---

[6] "A urethral stricture is a scar in or around the urethra, which can block the flow of urine, and is a result of inflammation, injury or infection."  Urethral Stricture Disease, *available at* http://www.urologyhealth.org/adult/index.

[7] Panendoscopy is a procedure by which the lining of the upper portion of the gastrointestinal tract, including the esophagus, stomach and duodenum, is examined.  Panendoscopy, *available at* http://www.yoursurgery.com/ProcedureDetails.

563).  The gastric biopsy results were negative.  (R. 566).

On September 17, 1999, Plaintiff underwent an endoscopy, consisting of a colonoscopy and random colon biopsy, to determine the cause of Plaintiff's chronic and persistent diarrhea and to rule out lymphocytic colitis and collagenous colitis.[8]  (R. 556-61).  The colonoscopy and biopsy were normal.  *Id*.

On November 27, 1999, presented to Millard Fillmore Suburban Hospital's emergency room with acute abdominal pain, where she was examined by Narhari Panchal, M.D. ("Dr. Panchal").  (R. 537-38).  Dr. Panchal's impression was acute appendicitis and Plaintiff was prepared for surgery.  (R. 538, 547).   Following the appendectomy, Plaintiff's postoperative diagnosis was retrocecal appendicitis, meaning Plaintiff's appendix was located behind of the cecum (pouch at the beginning of the large intestine into which the small intestine opens), in contrast to the usual position in front of the cecum.  (R. 547).  The morning following the procedure, Plaintiff was nauseous and kept on IV hydration and antibiotics.  (R. 514).  On the morning of November 29, 1999, Plaintiff was comfortable, but had some dysuria (pain with urination), for which she was examined by Samuel Kriegler, M.D. ("Dr. Kriegler").  (R. 514).  Plaintiff was discharged on November 29, 2000, in stable condition, and advised to rest, diet as tolerated, take Tylenol for pain, and continue her medications as before the appendectomy.  (R. 514).

---

[8] Both lymphocytic colitis and collagenous colitis are inflammatory bowel diseases, also known as microscopic colitis, for which "there is no sign of inflammation on the surface of the colon when viewed with a colonoscopy or flexible sigmoidoscopy" and, thus, requires a biopsy for diagnosis.  Collagenous Colitis and Lymphocytic Colitis, *available at* http://digestive.niddk.nih.gov/diseases/pubs/collagenouscolitis/index.htm.

On January 21, 2000, Plaintiff was examined by Christian D. Lates, M.D. ("Dr. Lates"), in connection with her urological and depression complaints.  (R. 303-06).  Dr. Lates assessed a congenital urology anomaly and depression for which Paxil was prescribed.  (R. 306).  On February 2, 2000, Plaintiff underwent a urethral dilation performed by surgeon Norman Hornung, M.D. ("Dr. Hornung").  (R. 506).  Postoperative diagnosis was urethral stricture.  (R. 506).

On February 4, 2000, Plaintiff underwent a cystoscopy and urethral dilation procedure performed by Dr. Kreigler, to investigate possible urethral stricture.  (R. 300).  At that time, Plaintiff's complaints included suprapubic pain, pressure and discomfort, an inability to completely empty her bladder, and recent UTI.  (R. 300).  Plaintiff's medications included Paxil (antidepressant), Donnatal (antispasmodic), and Cipro (antibiotic commonly prescribed to treat UTIs).  (R. 300).  As a result of the procedures, significant urethral stricture was ruled out and postoperative diagnosis was hypotonic bladder (underactive or flaccid bladder which does not contract as forcefully as necessary when voiding, causing the bladder to fail to completely empty and the remaining urine to dribble out the urethra), and recent UTI.  (R. 300).  It was decided that Plaintiff would be taught self-catheterization to enable Plaintiff to completely empty her bladder.  (R. 300).

On February 8, 2000, Plaintiff was examined on a consultative basis by gastroenterologist David E. Fay, M.D. ("Dr. Fay"), in connection with Plaintiff's complaints of suprapubic pain and diarrhea.  (R. 298-99).  Upon examination, Plaintiff's abdomen was soft and non-distended with normal bowel sounds, but there was tenderness in both lower quadrants without any mass or organomegaly (abnormal

8

enlargement of the organs) and the remainder of Dr. Fay's examination "was entirely

within normal limits."  (R. 299).  Dr. Fay's impression was that despite Plaintiff's claims

of diarrhea, Plaintiff was constipated and Dr. Fay "raise[d] the possibility of some degree

of somatization disorder or other psychiatric problems since [Plaintiff] had an odd affect

and the dynamic between [Plaintiff] and her mother is somewhat odd as well."  (R. 299).

Dr. Fay recommended Miralax (laxative) therapy "with an initial colonic purge followed

by a daily dose to keep [Plaintiff] moving her bowels a bit more than she has been

recently and see if it make any difference in her symptoms," but noted that Plaintiff "was

very unwilling at the present time to consider this."  (R. 299).  Instead, Dr. Fay

recommended a referral to a multidisciplinary pain service.  (R. 299).

On February 11, 2000, Plaintiff underwent a cystometrogram, performed by Dr.

Kriegler, to insert an indwelling Foley catheter[9] which it was hoped would improve

Plaintiff's bladder tone.  (R. 490).  Following the procedure, Plaintiff attempted to void,

but was unable to completely empty her bladder.  (R. 490).  Dr. Kriegler reported that

Plaintiff was to return within the following two weeks for another voiding trial.  (R. 490).

On February 18, 2000, Plaintiff underwent a cystometric examination performed

by Dr. Hornung, followed by a trial of voiding for her urinary retention.  (R. 501).  Durijg

the procedure, Plaintiff's bladder was filled to capacity at 250 cc and the Foley catheter

was removed, but Plaintiff voided to only 150 cc.  (R. 501).

On March 6, 2000, Plaintiff returned to Dr. Kriegler's office for another trial of

---

[9] "A Foley catheter is a thin, sterile tube inserted into your bladder to drain urine.  Because it can be left in place in the bladder for a period of time, it is also called an indwelling catheter.  It is held in place with a balloon at the end, which is filled with sterile water to hold it in place.  The urine drains into a bag and can then be taken from an outlet device to be drained."  Foley Catheter, *available at* http://www.emedicinehealth.com/foley_catheter/article_em.htm.

voiding and change of catheter if needed.  (R. 297).  At that time, Plaintiff's medications included Cipra and Puridium (for relief of burning, pain and urge to frequently urinate). (R. 297).  After removing the indwelling Foley catheter for the voiding trial, Plaintiff was unable to void on her own, so the catheter was reinserted and Plaintiff was to report in another three to four weeks for another voiding trial.  (R. 297).  Dr. Kriegler noted that he wanted to prescribe Urecholine (medication used to improve emptying the bladder) which was presently unavailable because of manufacturing problems.  (R. 297).

On March 23, 2000, Plaintiff was examined by urologist Kevin Pranikoff, M.D. ("Dr. Pranikoff"), pursuant to Dr. Lates's referral and in connection with Plaintiff's continuing complaints of lower abdominal discomfort.  (R. 294-95).  Dr. Pranikoff found Plaintiff's abdomen was soft with no masses, and mild tenderness with deep palpation in her upper quadrants and lower abdomen above the bladder.  (R. 294).  Plaintiff reported her pain was worse with the catheter in place.  (R. 294).  Dr. Pranikoff recommended a home voiding trial in which Plaintiff's Foley catheter would be removed at night.  (R. 294).  Dr. Pranikoff also noted that Plaintiff's mother is a visiting nurse who has been changing Plaintiff's catheters.  (R. 294).

On April 28, 2000, Plaintiff was examined by Michael Boccia, Ph.D. ("Dr. Boccia"), on a consultative basis on behalf of New York State Department of Temporary and Disability Assistance, Division of Disability Determinations.  (R. 308-11).  In response to Dr. Boccia's questioning regarding her employment history, Plaintiff explained that she has worked only part-time jobs because she cannot sit or stand for long periods of time and cannot lift more than a few pounds.  (R. 309).  According to Plaintiff, although she "tried hard to engage in regular employment [she] cannot perform

competently."  (R. 309).  Dr. Boccia noted the absence of any medical report indicating Plaintiff is unable to work.  (R. 309).

Plaintiff described her daily activities as watching television, listening to music, playing video games, working crossword puzzles and reading.  (R. 310).  Plaintiff was able to care for her personal needs, perform limited chores, shop, travel and drive short distances on a limited basis.  (R. 310).  Dr. Boccia considered Plaintiff to have "experienced significant diminishment in adjustment personally, socially, emotionally, and occupationally for most of her young adult life and perhaps even through her teenage years."  (R. 311).

Based on the examination, Dr. Boccia diagnosed traits of depressive and anxiety disorders, not otherwise specified, and lifelong history of UTIs.  (R. 311).  Dr. Boccia recommended Plaintiff continue to comply with her medical treatments and prescribed medications, that Plaintiff "might benefit from outpatient mental health counseling to complement her antidepressant medication and to help her cope more openly with her loss of autonomy and other desired and enjoyable functions," involvement in a support group with other young adults with similar medical problems and physical limitations, as well as involvement with the Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") to assess Plaintiff's academic and occupational skills to move her in a more productive and autonomous direction.  (R. 311).  Dr. Boccia concluded that his assessment of Plaintiff corroborated Plaintiff's allegations regarding her "troublesome medical problems," the diagnosis, extent and severity of which Dr. Boccia needed to verify with Plaintiff's treating physicians.  (R. 311).

On May 6, 2000, Plaintiff was reexamined by Dr. Kriegler who reported Plaintiff

had visited the emergency room the preceding weekend where a urinary culture

showed a bacterial UTI.  (R. 467).  Although the specific bacteria causing Plaintiff's UTI

had become resistant to Cipro, Plaintiff was given Cipro.  (R. 467).  Plaintiff performed a

trial of voiding, managing to void 100 cc of the 250 cc sterile solution instilled in her

bladder and showing an improvement over Plaintiff's last trial, but the trial insufficient to

support leaving the Foley catheter out.  (R. 467).  A new Foley catheter was inserted

and Plaintiff's dosage of Cipro was increased.  (R. 467).

On May 17, 2000, Plaintiff was examined by Mohammad Jaffri, M.D. ("Dr. Jaffri").

(R. 312-17). At that time, Plaintiff's medications included Cipro, Celexa (antidepressant),

Hydrocodone (narcotic analgesic) for abdominal pain, Flexeril (for pain and spasticity),

Pyradium (for bladder symptoms) and Prilosec (for heartburn).  (R. 312).  Dr. Jaffri's

physical examination of Plaintiff was largely unremarkable except for positive

tenderness in the lower abdomen and some complaints of pain at the site of the

catheter with partial squatting and straight leg test.  (R. 313).  Dr. Jaffri stated Plaintiff

should be considered to have some limitation as to lifting and carrying heavy weights

and some mild limitation as to sitting, standing and walking.  (R. 313).  Dr. Jaffri

diagnosed history of urethral stricture, recurrent UTIs, gastritis and lower abdominal

pain, history of TMJ disorder and headaches, and depression, and noted Plaintiff has

status post-nephrectomy for the right kidney, status post internal urethrotomy

cystoscopy and currently used an indwelling Foley catheter.  (R. 313).  Dr. Jaffri

reported Plaintiff's prognosis and "fair to guarded."  (R. 313).

On May 17, 2000, Plaintiff, upon referral by Dr. Lates, was also evaluated by

Matthew Antalek, D.O. ("Dr. Antalek") for her recurrent UTIs.  (R. 368-70).  Dr. Antalek

reported that both Plaintiff and her mother stated Plaintiff "has had persistent urinary tract infections for the past five years."  (R. 368).  Plaintiff explained that following treatment with antibiotics for 7 to 14 days, her UTI would reoccur within two weeks, and that for the past year she has had a fever.  (R. 368).  Plaintiff has had diarrhea for the previous two weeks with four to five bowel movements a day.  (R. 368).  Plaintiff's medications included Cipro and Celexa (antidepressant).  (R. 368).

Upon examination by Dr. Antalek, Plaintiff's temperature was 99.2°, her abdomen was soft and bowel sounds were present in all four quadrants.  (R. 369).  Dr. Antalek noted that Plaintiff's Foley catheter was in place and draining clear yellow urine.  (R. 369).  Urine cultures taken on May 3 and May 6, 2006, showed *Pseudomonas* and *Serratia* bacteria, and a urinalysis taken May 3, 2006 showed white blood cells of 6 to 25.[10]  (R. 369).

Dr. Antalek's impression that Plaintiff had recurrent UTIs related to her neurogenic bladder and persistent urethral stricture, without involvement of Plaintiff's kidney.  (R.369).  Dr. Antalek noted multiple possible causes of the UTIs, including the indwelling Foley catheter, urethral stricture and distended bladder, and also commented on the remote possibility that Plaintiff's UTIs were caused by an immunoglobulin deficit with the development of resistance given Plaintiff's long course of Cipro treatments.  (R. 369-70).  Dr. Antalek recommended repeat urine culture and urinalysis and, if no bacteria or white blood cells were present, prescribing Cipro for one month and then cycling Plaintiff's medication to avoid development of resistance to Cipra, suggesting

---

[10] White blood cells are normally not found in urine and their presence is often indicative of a UTI. Urine Test, *available at* http://.www.webmd.com/hw/health_guide_atoz/hw6580.asp.

that other antibiotics, including Bactrim and Macrodantin be considered.  (R. 370).  Dr.
Antalek recommended a CT scan of Plaintiff's sinuses to rule out chronic sinus
infection, and repeat blood tests to rule out hypogammaglobulinemia.[11]  (R. 370).

A urinalysis taken on June 3, 2000 showed abnormalities, including the presence
of nitrite and blood, epith cells, bacteria and white and red blood cells higher than
normal.  (R. 604).

On an SSA form completed on June 6, 2000 in connection with Plaintiff's
disability benefits application, Dr. Kriegler reported Plaintiff's diagnoses included a
hypotonic bladder, recurrent UTIs, and urinary retention with chronic pain, and noted
Plaintiff is status post-rght nephrectomy.  (R. 320).  Dr. Kriegler reported Plaintiff is
unable to completely void, her UTIs did not respond well to prescribed antibiotics and
she is unable to self-catheterize due to pain. (R. 321).  According to Dr. Kriegler,
Plaintiff's physical activities, including lifting and carrying, standing, walking and sitting
and pushing and pulling were limited by her pain caused by the Foley catheter.  (R.
322).

CT scans of Plaintiff's abdomen and pelvis were taken on June 19, 2000.  (R.
608-09).  The CT scan of Plaintiff's abdomen showed status post-right nephrectomy, the
left kidney showed normal functioning but some compensatory hypertrophy
(enlargement or overgrowth of a body part or organ sometimes attributed to increased
use).  (R. 609).  The CT scan of Plaintiff's pelvis was "essentially unremarkable."  (R.

---

[11] "Hypogammaglobulinemia is a disorder that is caused by low levels of immunglobulins
(antibodies) in the blood.  It is an immune deficiency disorder that can be acquired or inherited."
Hypogammaglobulinemia, *available at*
http://www.ebiocenter.com/infocenter/consumer/conditionlib/hypogam.html.

609).

On June 28, 2000, Verna Yu, M.D. ("Dr. Yu"), a New York State agency physician reviewed Plaintiff's medical record and noted Plaintiff's history of urethral stricture, recurrent UTIs, and affective disorder, and Foley catheter use.  (R. 334-41). Dr. Yu found exertional limitations, including occasionally lifting and carrying of no more than 20 pounds, frequent lifting and carrying of no more than 10 pounds, sitting, standing or walking for up to six hours in an eight hour day, and unlimited pushing and pulling other than as for lifting and carrying.  (R. 335).  According to Dr. Yu, Plaintiff had no postural, manipulative, visual, communicative or environmental limitations.  (R. 336-38).   Dr. Yu's assessment was affirmed by state agency physician George J. Burnett, M.D. ("Dr. Burnett") on September 25, 2000.  (R. 341).

On July 17, 2000, Plaintiff underwent a cystoscopy performed by urologist Kevin J. Barlog, M.D. ("Dr. Barlog"), during which Plaintiff's bladder "was carefully inspected," and showed no evidence of superficial tumor or acute or chronic cystitis, bladder capacity was normal and the urethra showed no evidence of obstruction.  (R. 362). Following the procedure, Dr. Barlog's impression was that Plaintiff's "urinary retention may indeed by psychogenic, but the treatment should be clean intermittent catheterization and a lot of support which will be offered to her."[12]  (R. 362).  Plaintiff was to return to Dr. Barlog's office within the next two weeks "to start clean intermittent catheterization."  (R. 362).

---

[12] In contrast to catherization using an indwelling Foley catheter, "[i]ntermittent catherization involves the temporary placement of a catheter (tube) to remove urine from the body.  This is usually done by placing the catheter through the urethra to empty the bladder.  Medical Encyclopedia: Clean intermittent self-catheterization, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/003972.htm.

Dr. Antalek reexamined Plaintiff on July 26, 2000, noting that Plaintiff had "moved on to Dr. Kevin Barlog and he feels that [Plaintiff] is having urinary retention due to a psychogenic nature secondary to a psychogenic cause." (R. 260). Dr. Antalek stated Plaintiff reported having difficulty performing self-catheterization and was to return to Dr. Barlog's office for further training. (R. 360). Plaintiff continued to complain of abdominal pain and reported the indwelling Foley catheter continued to burn the urethra. (R. 360). Plaintiff provided Dr. Antalek with a list of temperature readings ranging from 99.6° to 101° which Plaintiff reported occurred on a daily basis. (R. 360).

Physical examination was essentially normal except for Plaintiff's temperature which was 99.8° and voluntary guarding on gentle palpation of all regions of the abdomen. (R. 360). Dr. Antalek's opinion was that Plaintiff "has ongoing fever" for which Plaintiff's urinary tract was not the sole source, and for which a "work-up" consisting of "an extensive collection of laboratory studies including most of the connective tissue disease" was ordered. (R. 360). Dr. Antalek further commented that he advised Plaintiff to work with Dr. Barlog to "straight catheterize her own bladder" because Dr. Antalek believed Plaintiff's indwelling Foley catheter "sets her up for a possible urosepsis" (bloodstream disease caused by a UTI). (R. 361).

Plaintiff underwent a series of laboratory blood and urine tests on July 26, 2000. (R. 598-602). Specifically, immunology testing showed some abnormalities, (R. 600-01), urinalysis testing abnormalities included the presence of nitrite and protein, epith cells, white blood cells and bacteria, (R. 599), and hematology testing showed low red blood cell count, high MCH (mean corpuscular hemoglobin), low MPV (mean platelet volume), and high blood sugar. (R. 598).

On August 3, 2000, Plaintiff, pursuant to Dr. Lates's referral, was examined by urologist Emilia Phillips, M.D. ("Dr. Phillips") of Northtown Urology.  (R. 354-59).  Dr. Phillips noted Plaintiff presented with a "somewhat depressed affect," and was diffusely tender over her abdomen, especially the lower abdominal quadrant, but there was no guarding rebound and bowel sounds were present.  (R. 354).  Dr. Phillips observed that the indwelling Foley catheter was in place, but was "slightly large for this patient and we subsequently changed it to a smaller catheter."  (R. 354).  Dr. Phillips questioned the need for prophylactic Cipra which could lead to resistance.  (R. 354).

When Plaintiff returned to Dr. Antalek's office on August 8, 2000 for follow-up, she complained of diarrhea occurring ten times a day and reported she stopped taking Cipro four days earlier, and had been placed on hydrocone for abdominal pain and discomfort.  (R. 352-53).  Plaintiff also reported that because of difficulty learning the straight catheterization technique, the indwelling Foley catheter remained in place.  (R. 352).  Physical examination was unremarkable, although abdominal exam showed protective guarding on light palpation.  (R. 352).  Dr. Antalek's review of Plaintiff's laboratory tests date showed her work-up for a connective tissue disease or a vasculitis is "completely normal" with the exception of "a mildly decreased C3 and C4 level" on the immunology tests.[13]  (R. 352).  Dr. Antalek's impression was that there was likely a psychogenic component to Plaintiff's continuing GI and GU symptoms and he concurred

---

[13] The terms "C3" and "C4" identify a component of the complement protein, which constitute a serum enzyme system that mediates inflammation, and are activated by a specific immunologic event. The most commonly measured complement proteins are the serum level of C3 and C4, which are particularly useful in evaluating kidney involvement and monitoring diseases such as lupus over time. Laboratory Tests Used to Diagnose and Evaluate SLE, *available at* http://www.webmd.com/content/article/5/1680_51589.htm.

with Dr. Barlog's assessment that "there is no obvious anatomical reason to explain her urinary retention."  (R. 352).  Dr. Antalek suggested Plaintiff seek some psychiatric treatment from Dr. Jeffrey Lackner, a clinical psychologist.  (R. 352).  X-rays of Plaintiff's lumbosacral spine taken on September 9, 2000, in connection with Plaintiff's complaints of pain were unremarkable.  (R. 451).

On September 30, 2000, Plaintiff underwent a flexible sigmoidoscopy procedure performed by Daniel S. Camara, M.D. ("Dr. Camara"), to investigate the cause of Plaintiff's recurrent UTIs, "severe diarrhea, nausea and vomiting with severe abdominal pain."  (R. 449).  The procedure was remarkable for "significant esophagitis at the level of the gastroesophageal junction with erosion,"[14] and "antral gastritis."[15]  (R. 449).

On October 16, 2000, Plaintiff underwent a cystogram and cystoscopy performed by urologist Christopher J. Skomra, M.D. ("Dr. Skomra").  (R. 439).  Plaintiff's "bladder interior was mildly inflamed [*sic*] from the eight months of indwelling catheter drainage, however, there were no diverticula [bladder outlet obstruction], foreign bodies, or tumors."  (R. 439) (bracketed text added).  Dr. Skomra's disposition was to recommend Plaintiff undergo full neurologic evaluation and be instructed in clean intermittent catheterization.  (R. 440).

---

[14] "Esophagitis is a general term for any inflammation, irritation, or swelling of the esophagus, the tube that leads from the back of the mouth to the stomach."  Medical Encyclopedia: Esophagitis, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/001153.htm.

[15] "Antral gastritis is a form of gastritis confined to the antrum [upper part of the stomach].  Coffee, tobacco, alcohol, and H. pylori are all thought to be implicated as an etiology.  Although patients with an antral gastritis are found to have increased, normal, and decreased secretion of peptic acid, treatment for this disorder is primarily aimed at acid suppression therapy."  Antral Gastritis, *available at* http://www.rad.ushus.mil/medpix/medpix.html?mode=single&comebackto=mode%3Dgeo_browse&recnum =3552 (bracketed text added).

On November 1, 2000, Plaintiff visited Dr. Skomra's office for instruction on intermittent catheterization.  (R. 438).  Plaintiff demonstrated three times that she could catheterize herself, stated she would try the procedure at home, and that if she ran into any problems, would seek her mother's assistance.  (R. 438).

When Plaintiff next visited Dr. Skomra on February 15, 2001, Plaintiff admitted she was never able to perform the intermittent catheterization and, instead, Plaintiff's mother had been catheterizing her in the morning and that Plaintiff would remove the catheter in the evening.  (R. 434).  Plaintiff stated she had removed the catheter the previous Friday.  (R. 434).  Dr. Skomra further reported that Plaintiff "has been doing what sounds like Valsalva voiding," a method of voiding by increasing pressure inside the abdomen by bearing down as if having a bowel movement, had joined a health club and "increased her abdominal musculature quite a bit."  (R. 434).  Dr. Skomra warned Plaintiff that severe long-term Valsalva voiding could cause server hemorrhoids and, eventually, vaginal prolapse.  (R. 434).  Plaintiff's postvoid residual level was 0 cc.  (R. 434).

Plaintiff was next examined by Dr. Skomra on March 1, 2001 when Plaintiff complained of some burning with urination despite taking antibiotics.  (R. 431).  Plaintiff was instructed to continue with the medication, to call if her symptoms did not improve, and her urine sample was sent for a culture.  (R. 431).

Upon examination by Dr. Skomra on March 15, 2001, Plaintiff was "still spontaneously voiding," mostly through use of the Valsalva manuever.  (R. 428).  Plaintiff had been "physically working out," demonstrated "pretty strong Valsalva pressures," and was "emptying reasonably," albeit with some mild dysuria.  (R. 428).

Dr. Skomra again warned Plaintiff about the possible long-term adverse consequences of Valsalva voiding, but Plaintiff did not want to consider other options such as catheterization.  (R. 428).  Plaintiff's bladder had "only 83 ml postvoid residual" and the urine culture taken a couple of weeks prior was negative.  (R. 428).  Dr. Skomra prescribed Flomax[16] "to see if reducing her outward pressure is of benefit to her."  (R. 428).

On May 31, 2001, Plaintiff was examined by Dr. Skomra who reported Plaintiff "has a nueropathic bladder, probably from longstanding voiding dysfunction."  (R. 425). At that time, Plaintiff continued to Valsalva void and refused to catheterize despite Dr. Skomra's repeated warnings that Valsalva voiding could eventually cause "severe loss of vaginal support."  (R. 425).

Upon examination on July 31, 2001, Dr. Skomra reported Plaintiff "Valsalva voids with a neuropathic bladder."  (R. 421).  Plaintiff complained of a UTI for which Dr. Skomra prescribed Levaquin, an antibiotic.  (R. 421).  Dr. Skomra again warned Plaintiff of the long-term consequences of Valsalva voiding.  (R. 421).  Plaintiff informed Dr. Skomra that she recently obtained a bartender position.  (R. 421).  Dr. Skomra ordered a cystoscopy and urine culture. (R. 421).

Urinalysis results dated July 31, 2001, were essentially normal and without any evidence of UTI.  (R. 422-24).

When Plaintiff returned to Dr. Camara on July 18, 2001, Dr. Camara observed

---

[16] Flomax is a drug generally used "for the treatment of men who are having difficulty urinating" because of an enlarged prostate.  Tamsulosin, *available at* http://www.medicinenet.com/tamsulosin/article. htm.

Plaintiff "has had a dramatic improvement." (R. 448). Dr. Camara reported Plaintiff had gained 10 pounds, no longer has a urinary catheter, took no medications, moved her bowels once a day without diarrhea, and had "very good control of her urinary tract and incontinence." (R. 448). Dr. Camara opined that Plaintiff's dramatic improvement "most likely had nothing to do with any medication," and attributed the improvement to Plaintiff's commencement of an exercise program. (R. 448). Dr. Camara continued that most of Plaintiff's symptoms were "mostly functional," and that Plaintiff's "urinary incontinence triggered a state of depression since [Plaintiff] had to have an indwelling Foley catheter at all time[s] which limited her social life to an extreme." (R. 448) (bracketed text added).

At the ALJ hearing held September 17, 2001, Plaintiff, represented by Richard Abbott, Esq., appeared and testified. (R. 31-50). In response to the ALJ's questions, Plaintiff stated that she was 5' 9" tall, weighed 121 pounds, was a high school graduate, but had no skills or vocational training. (R. 32). Since December 31, 1998, Plaintiff had worked various part-time jobs, but had no other sources of income. (R. 32-33). Throughout the closed period, Plaintiff had worked part-time for Time Warner as a book vendor, a job that required Plaintiff to travel to two local home improvement stores, twice a week, where she would tend to the books and magazines display, straightening the displays, replacing missing books and magazines and adding new ones. (R. 36-37, 40). The book vendor job hours were not set and Plaintiff could perform the job any time she wanted. (R. 41). As each store visit took approximately an hour, Plaintiff worked the book vendor position 4 to 5 hours a week, and was paid $19 per store visit. (R. 37, 40-41).

Plaintiff had worked 18 to 25 hours a week as a video store rental clerk from August 1997 through April 1999, which included cashier duties and stocking the display shelves.  (R. 38-39).  Plaintiff quit the video store rental clerk position when her employer refused Plaintiff's request for a leave of absence while she attempted to recover from the  internal urethrotomy cystoscopy performed on April 20, 1999, during which the indwelling Foley catheter was surgically implanted.  After Plaintiff's health began to improve, following the removal of the indwelling Foley catheter, Plaintiff obtained two other part-time positions, working a total of 40 to 45 hours per week between the three jobs.  (R. 34-35, 45).

Plaintiff explained that although she suffered no complications from her November 1999 appendectomy, in 2000 she began suffering adverse side effects from the antibiotics she took for her recurrent UTIs.  (R. 46).  According to Plaintiff, the antibiotics caused severe gastritis that made her vomit.  (R. 46).  The gastritis resolved when Plaintiff stopped taking her medications in February 2001.  (R. 46).  Plaintiff also testified that the depression she began experiencing at the end of 1998, when the inability to void and resulting recurrent UTIs attributed to the February 18, 1997 right nephrectomy had yet to be resolved, made her feel so "horrible" that she did not want to get out of bed, talk to anyone or see her friends.  (R. 46).  When Plaintiff eventually sought medical help for her depression, she was prescribed the antidepressant Paxil, which she took for six months.  (R. 47).

Plaintiff also sought pain rehabilitation for her flank pain, and such treatment included use of a TENS unit and six acupuncture treatments.  (R. 47-48).  According to Plaintiff, she spent two years, 1999 and 2000, trying to manage her pain.  (R. 48).

22

Plaintiff listed the medications she was on during the two year closed period as "various antibiotics, various painkillers, Paxil," and hydrocodone, a narcotic analgesic.  (R. 49). As a result of the antibiotics, Plaintiff experienced ulcers and fatigue.  (R. 50).

Testimony was also taken from Plaintiff's father, Carl Franklin Janas ("Mr. Janas"), who explained that during the closed period, he observed that Plaintiff often had difficulty with normal activities of daily living.  (R. 51-55).  According to Mr. Janas, Plaintiff would lie on the couch "for hours and hours," crying from pain, and had difficulty walking.  (R. 52).  Mr. Janas described Plaintiff as walking "hunched over," and "stoop[ed] forward," and that Plaintiff could not lift.  (R. 53).  Mr. Janas assisted Plaintiff with the physical part of her book vendor job.  (R. 52).  Mr. Janas testified that while Plaintiff had the indwelling Foley catheter, some days were better than others, but that Plaintiff passed most of the day lying on the couch, getting up only to use the bathroom or to eat.  (R. 54).  Mr. Janas further testified that Plaintiff socialized very little during the closed period, explaining that some friends would occasionally visit, but that as Plaintiff was unable to go places and do things with her friends, they visits became more infrequent.  (R. 54-55).  Mr. Janas stated that he and his wife were amazed at Plaintiff's improvement after the catheter was removed.  (R. 55).

## DISCUSSION

## 1.    Disability Determination Under the Social Security Act

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

to engage in any substantial gainful activity by reason of any medically

> determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).  Once the claimant proves that he is severely impaired and is unable to perform any past relevant work, the burden shifts to the Commissioner to prove that there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2nd Cir. 1980).  "In assessing disability, the [Commissioner] must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'"  *Monguer v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

A.      **Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, he must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence

of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3).  "Congress has instructed . . . that the factual findings of the Secretary,[17] if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step analysis that the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520 and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits.  *Id.*  The next step is to determine whether the applicant has a severe impairment which significantly limits his physical or

---

[17] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.  In accordance with § 106(d) of that Act, the Commissioner of Social Security has been substituted for the Secretary of Health and Human Services as the defendant in this action.

mental ability to do basic work activities, as defined in the regulations.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  Absent an impairment, the applicant is not eligible for disability benefits.  *Id.*  Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption that an applicant with such an impairment is unable to perform substantial gainful activity.[18]  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920.  *See also Cosme v. Bowen*, 1986 WL 12118, at *2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the applicant can still perform work he has done in the past, the applicant will be denied disability benefits.  *Id.*  Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [his] past work").  If the Commissioner finds that the applicant cannot perform any other work, the

---

[18] The applicant must meet the duration requirement which mandates that the impairment must last for at least a twelve month period.  20 C.F.R. §§ 404.1509 and 416.909.

applicant is considered disabled and eligible for disability benefits. *Id.* The applicant

bears the burden of proof as to the first four steps, while the Commissioner bears the

burden of proof on the final step relating to other employment. *Berry, supra*, at 467. In

reviewing the administrative finding, the court must follow this five-step analysis to

determine if there was substantial evidence on which the Commissioner based her

decision. *Richardson v. Perales*, 402 U.S. 389, 410 (1971).


**B.   Substantial Gainful Activity**

The first inquiry is to determine whether the applicant is engaged in substantial

gainful activity. "Substantial gainful activity" is defined as "work that involves doing

significant and productive physical or mental duties and is done for pay or profit." 20

C.F.R. §§  404.1510 and 416.910.

In this case, the ALJ concluded that Plaintiff did not engage in substantial gainful

activity for the period May 1, 1999 and May 1, 2001, the closed period for which Plaintiff

seeks disability benefits.[19]  (R. 17, 24).  This finding is not disputed.


**C.   Severe Physical or Mental Impairment**

The next step of the analysis is to determine whether Plaintiff had a severe

physical or mental impairment significantly limiting his ability to do "basic work

_____

[19] Although in the Evaluation of the Evidence portion of the Hearing Decision, the ALJ stated the closed period as running from May 1, 1999 through March 1, 2001 (R. 17), in her Findings, the ALJ states the closed period as March 1, 1999 through March 1, 2001 (R. 24).  The discrepancy is explained by the fact that Plaintiff initially delineated the closed period as March 1, 1999 through March 1, 2001 (R. 33), but Plaintiff's earnings rendered her ineligible for disability benefits for he months of March and April 1999.  (R. 17).

activities."  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it "significantly limit[s]" the applicant's physical and mental ability to do such basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

The ALJ concluded that Plaintiff has several impairments preventing her or limiting her ability to do basic work activities and are thus, severe as defined under the applicable regulation, 20 C.F.R. § 404.1521.  (R. 18).  Plaintiff's severe conditions include a neurogenic bladder, recurrent urethral stricture with urinary retention, recurrent urinary tract infections, gastritis, esophagitis at gastroesophageal junction, history of anorexia nervosa, and status post right pelvic kidney nephrectomy.  (R. 18). The ALJ then continued on to the next step, a finding of whether Plaintiff's impairments were severe enough to be set forth in the Listing of Impairments, Appendix 1, 20 C.F.R. Pt. 404, Subpt. P, Regulation No. 4.

## D.    Listing of Impairments, Appendix 1

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P.  If the impairments are listed in the Appendix, they are considered severe enough to prevent

an individual from performing any gainful activity.  20 C.F.R. §§ 404.1525(a),

416.920(a)(4)(iii) and 416.920(d).  In the instant case, while the ALJ determined that

despite numerous medical impairments interfering with Plaintiff's ability to work, none of

Plaintiff's impairments were so severe as to meet the criteria of any of the impairments

set forth in the Listing of Impairments.  (R. 18-20).  Substantial evidence in the record

supports this finding, and Plaintiff does not argue otherwise.  Accordingly, the court

need not further consider whether any of Plaintiff's medical impairments meets the

criteria of any impairment set forth in the Listing of Impairments.

The ALJ next considered whether Plaintiff, despite her numerous medical

impairments, none of which either meet nor equal any listed impairment, nevertheless

retains the residual functional capacity to perform the requirements of her past relevant

work.  (R. 21-23).

**E.**     **"Residual Functional Capacity" to Perform Past Work**

The fourth inquiry in this five-step analysis is whether the applicant has the

"residual functional capacity" to perform past relevant work.  "Residual functional

capacity" is defined as the capability to perform work comparable to the applicant's past

substantial gainful activity.  *Cosme, supra*, at *3.

The ALJ found that throughout the closed period, Plaintiff retained the residual

functional capacity to perform her past relevant work as a video store rental clerk.  (R.

24-25).  Plaintiff challenges this finding, arguing that the ALJ failed to properly evaluate

her complaints of pain and the treating physician's opinion, and further erred by failing

to consider Plaintiff's inability to engage in substantial gainful activity.  Plaintiff's

Memorandum at 2.

Initially, it is the clear rule in the Second Circuit that "all complaints . . . must be considered together in determining . . . work capacity." *DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930, 937 (2d Cir. 1984). It is improper to determine a claimant's work capacity based solely upon an evaluation of the severity of the claimant's individual complaints. *Gold v. Secretary of Health and Human Services*, 463 F.2d 38, 42 (2d Cir. 1972).

To make such a determination, the Commissioner must first show that the applicant's impairment or impairments are such that they permit certain basic work activities essential for other employment opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities." *Decker, supra*, at 294. An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very heavy" work. *Id.* In addition, the Commissioner must prove that the claimant's skills are transferrable to the new employment, if the claimant was employed in a "semi-skilled" or "skilled" job. *Decker, supra*, at 294. This element is particularly important in determining the second prong of the test, whether suitable alternative employment exists in the national economy. *Id.* at 296.

In this case, in determining that Plaintiff remained able to perform her past work as a video store rental clerk throughout the close period and, in fact, could perform the

full range of light work,[20] except for work involving exposure to extreme cold and more than occasional crouching and stooping, the ALJ discredited the testimony of both Plaintiff and her father regarding Plaintiff's subjective allegations of pain.  (R. 24).  However, as discussed *infra*, in discrediting such testimony, the ALJ placed undue emphasis on the absence of objective clinical findings and made several findings not supported by the record.

It is established within the Second Circuit that "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence.*"  Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (citing *Ber v. Celebrezze*, 442 F.2d 293 (2d Cir. 1964)).  Specifically,

> If pain is real to the patient and as such results in that person being physically unable to engage in any gainful occupations suited to his training and experience, and this results from 'any medically determinable physical or mental impairment', the disability entitled the person to the statutory benefits even though the cause of such pain cannot be demonstrated by 'objective clinical and laboratory findings.'

*Page v. Celebrezze*, 311 F.2d 757, 762-63 (2d Cir. 1963) (internal citation omitted).

The Commissioner, however, is not obliged to accept without question the credibility of subjective findings.  *Marcus*, *supra*, at 27.  In particular, the Act

> does require that the disabling condition result from a 'medically determinable physical or mental impairment.'  But it does not restrict medical investigation, examination and opinion to only those things described as 'objective clinical' or 'laboratory findings.'

*Page*, *supra*, at 763.

---

[20] "Light work" is defined as: "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §404.1567(b).

In other words, "[t]he ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus*, *supra*, at 27.

In the instant case, the ALJ, in determining Plaintiff retained the residual functional capacity and discrediting her pain allegations, made several findings that are not supported by the record. In particular, the ALJ states that the record contains "suggestion[s] of improper or inadequate eating habits." (R. 19 (referencing R. 357, 469 and 635)). However, the referenced "suggestions of improper or inadequate eating habits" include a statement on a "New Patient Information" form completed by Plaintiff on her first visit to Dr. Phillips on August 3, 2000, during the closed period, that Plaintiff is on a special diet consisting of "2000 calories per day" and "no meat." (R. 357). On an undated "Surgical History and Physical Exam" form from Kaleida Health, it is noted that Plaintiff is "vegetarian - works w/ dietician." (R. 469). Finally, Dr. Kriegler's operative report prepared in connection with a cystoscopy performed on January 13, 1997, prior to the closed period, notes that Plaintiff "has a history of anorexia nervosa which the mom says was resolved prior to the development of this chronic pain syndrome." (R. 635).[21] Although Plaintiff does not dispute that she, at one point, suffered from anorexia nervosa, no physician or any other medical treatment provider has expressed any opinion or concern that Plaintiff continued to suffer from such condition either immediately prior to or during the closed period. As such, none of these statements supports the ALJ's finding that Plaintiff has "improper or inadequate eating

---

[21] In fact, the ALJ speculated that Plaintiff's "complaints of 'poor appetite' may be an indication that anorexia nervosa continued although she did not admit to it." (R. 19).

habits."  (R. 19).

Similarly, the ALJ states that Plaintiff has a history of tobacco abuse, citing

Plaintiff's admission that on a daily basis she smoked half a pack of cigarettes.  (R. 19

(referencing R. 367 (Dr. Antalek encouraging Plaintiff "to discontinue her smoking"); R.

413 (noting Plaintiff smokes one half to a whole pack of cigarettes on a daily basis); R.

556 (Plaintiff "smoke one-half pack of cigarettes per day but does not drink"); and R.

562 (same)).  While the undersigned does not condone Plaintiff's smoking, the record is

devoid of any suggestion that Plaintiff's smoking in any way contributed to Plaintiff's

urological problems, which provide the clinical basis for her expressions of debilitating

pain, or rendered her testimony less credible and, as such, the fact that Plaintiff smokes

does not bear on whether she was disabled during the closed period.

Further, the Second Circuit has observed that "ALJs are specifically instructed

that credibility determinations should take account of 'prior work history,'" and that "a

good work history may be deemed probative of credibility."  *Schaal v. Apfel*, 134 F.3d

496, 502 (2d Cir. 1998) (citing 20 C.F.R. § 416.929(c)(3); and Social Security Ruling 96-

7p, 61 Fed. Reg. 34, 483, at 34, 486 (1996)).  *See Rivera v. Schweiker*, 717 F.2d 719,

725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial

credibility when claiming an inability to work because of a disability.").

In the instant case, the ALJ, rather than crediting Plaintiff's work history which,

both prior to and after the closed period, included working multiple jobs, as probative of

Plaintiff's credibility regarding the extent of her asserted pain, commented that Plaintiff's

failure to reapply for her video store rental clerk position "after a brief post-operative

period" supports the determination that Plaintiff was unwilling, rather than unable to

work during the closed period.  (R. 22).  However, the opposite conclusion is more logical.  Specifically, nothing in the record supports any finding that Plaintiff's post-operative period was "brief."  Rather, the record establishes that despite the absence of any obvious surgical complications with regard to Plaintiff's right nephrectomy, performed in 1997, Plaintiff began to experience urological problems, including an inability to void, resulting in persistent UTIs.  Following the April 20, 1999 cystoscopy during which the indwelling Foley catheter was initially inserted, Plaintiff's complaints of UTIs and pain significantly increased, and the medications prescribed for the UTIs caused Plaintiff to suffer from gastritis.  However, after Plaintiff began to exercise to strengthen her abdominal muscles in early 2001, she also gained the ability to void, albeit through the Valsalva maneuver, thereby enabling Plaintiff to remove the catheter, as well as to decrease the urinary residue, both of which had contributed to her UTIs.  Once the UTIs resolved, Plaintiff was able to cease taking the antibiotics and pain medication which Plaintiff's treating sources had identified as the cause of Plaintiff's gastritis, as is further evidenced by the fact that Plaintiff was finally able to gain some weight.  This sequence of events is consistent with Plaintiff's statement to Dr. Boccia in April 2000, during the closed period, that "she tried hard to engage in regular employment but [could not] perform competently."  (R. 309).

It is also significant that no treating physician ever questioned Plaintiff's credibility regarding her complaints of pain and discomfort, for which Plaintiff was prescribed pain relief medications, including narcotics.  (R. 312, 352-53).  Indeed, although the ALJ remarked that Dr. Antalek stated "there is most likely a psychogenic component" to Plaintiff's impairments (R. 19 (citing R. 352)), Dr. Antalek did not discount Plaintiff's

complaints but, rather, suggested Plaintiff be evaluated by a clinical psychologist, Dr.

Lackner, who had experience treating patients with chronic pain syndromes, noting that

Dr. Lackner's technique frequently involved behavior modification.  (R. 352).  As such,

Dr. Antalek's report gives credence to Plaintiff's pain allegations.  Additionally, Plaintiff's

testimony regarding the pain caused by her condition is largely corroborated by her

father's testimony, for which the ALJ provides no reason for discrediting.

The ALJ also found, erroneously, that although Plaintiff testified she only worked

four hours per week, Plaintiff had previously reported working one eight-hour day per

week.  (R. 22 (citing R. 197)).  However, a thorough review of the referenced page and,

indeed, the entire exhibit in which the referenced page appears, does not support the

statement.  In particular, the referenced exhibit of the Administrative Record consists of

a New York State Office of Temporary and Disability Assistance Division of Disability

Determination form, completed by Plaintiff on April 16, 2000.  (R. 196-98).  On page 2 of

the form, Plaintiff indicated that she had worked as a book vendor from August 1998 to

the present, but had a hard time lifting boxes.  (R. 197).  Plaintiff also reported that she

had previously worked as a video store rental clerk from September 1997 until April

1999, but had to resign the position when her employer refused her request for a leave

of absence to recover from surgery which rendered her unable to stand on her feet

without increased pain.  (R. 197).  Nowhere within the form did Plaintiff indicate she

ever worked an eight-hour day, either before or during the closed period.  As such, the

referenced exhibit does not support the ALJ's finding that Plaintiff, despite asserting to

the contrary, worked an eight-hour day once a week.

While a plaintiff's subjective complaints are not alone sufficient to support a

finding of disability, such complaints must be accorded weight when they are accompanied by "evidence of an underlying medical condition" and an "objectively determined medical condition [which is] of a severity which can reasonably be expected to give rise to the alleged pain." *Cameron v. Bowen*, 683 F.Supp. 73, 77 n.4 (S.D.N.Y. 1984).  Here, significantly absent from the ALJ's hearing decision is any discussion regarding the effect of Plaintiff's recurrent UTIs, which are supported by objective, medical findings, as well as the persistent low grade fever Plaintiff endured for much of the closed period.  (R. 360, 368).  The ALJ's attribution of Plaintiff's dramatic improvement upon removing the indwelling Foley catheter to Plaintiff's participation in an exercise program ignores the fact that Plaintiff still remains unable to void in a usual manner but, rather, is able to void only through use of the Valsalva maneuver.  That Plaintiff continues to Valsalva void despite the potential for serious adverse physical effects posed by the maneuver, of which Dr. Skomra repeatedly warned Plaintiff, underscores Plaintiff's desire to avoid use of a catheter, which she maintains was painful.  (R. 421, 425, 428, 434).  Thus, the fact that such removal may have contributed to Plaintiff's recovery does not negate but, rather, reinforces a finding that Plaintiff suffered from an objective medical condition that "could reasonably be expected" to cause Plaintiff's asserted pain.

The ALJ also discounted the severity of Plaintiff's urinary problems on the basis that such problems had a "psychogenic component."  (R. 19).  Even assuming, however, a "psychogenic component" did underlie Plaintiff's urinary retention and neurogenic bladder, the psychological nature of such problems does not, by itself, warrant dismissing the impact of Plaintiff's residual functional capacity.   *See Page*,

*supra*, at 763 (stating in *dicta* that a claimant can be disabled "by reason of psychosomatic or psychoneurotic involvements" provided there is some organic or neurotic basis for the alleged pain); *Martinez v. Heckler*, 629 F.Supp. 247, 249-51 (E.D.N.Y. 1986) (remanding for calculation of benefits where ALJ erred by relying heavily on his own observations of disability claimant to discredit claimant's alleged level of psychogenic pain). Here, it is significant that despite opining as to the psychogenic nature of Plaintiff's urinary problem, Dr. Antalek nevertheless did not discredit Plaintiff's subjective complaints but, rather, recommended Plaintiff seek psychological counseling to help her manage the pain. (R. 352).

Additional statements of a speculative nature by the ALJ that are not supported by the record. Specifically, the ALJ maintained that Plaintiff's anorexia nervosa continued, notwithstanding the absence of any evidence to support such a finding, that Plaintiff's relationship with her mother was perceived by one medical source as "odd," and that although Plaintiff's mother is a nurse, her mother did not testify on Plaintiff's behalf at the administrative hearing. (R. 19, 20). Such adverse speculation further undermines the ALJ's determination. *See Rivera v. Sullivan*, 771 F.Supp. 1339, 1355 (S.D.N.Y. 1991) (observing the ALJ's decision is undermined by reliance on pure speculation as to whether claimant's physician's reference to drowsiness was intended to refer to a "possible" side effect of medications, or to the claimant's actual reaction to medication). The ALJ's unwarranted overreaching to discredit Plaintiff's subjective complaints strongly suggests the ALJ found it necessary to discredit such complaints to support the ALJ's conclusion that Plaintiff was not disabled during the closed period and is contrary to the Second Circuit's statement that "'the Social Security Act is a remedial

statute, to be broadly construed and liberally applied.'" *Monguer*, *supra*, at 1037 (quoting *Gold*, *supra*, at 41)).

Where, as here, the ALJ has made findings that are not supported by the record, the decision cannot be upheld. *Rivera*, *supra*, at 1351. Further, upon determining that the ALJ's determination is not supported by the record, the court must decide whether to remand for further development of the record, or for calculation of benefits. *Parker*, *supra*, at 235. Where there are gaps in the administrative record, or where the Commissioner has applied an incorrect legal standard, remand for further development of the record or consideration of the evidence is appropriate. *Id*. Where, however, the record is complete and provides persuasive proof of disability, remand for further development or consideration would serve no useful purpose and remand solely for calculation of benefits is appropriate. *Id*.

In the instant case, there are no gaps in the administrative record such that remand for further development of the record would be useless. Further, the ALJ's erroneous discrediting of Plaintiff's subjective complaints substantially undermines the ALJ's decision, which, as discussed, is heavily predicated on the discrediting of such complaints, and establishes that remand for further consideration of the evidence would be futile. As such, remand solely for calculation of benefits is proper.

**CONCLUSION**

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc. No. 9) should be DENIED and the matter should be remanded for calculation of benefits for the closed period May 1, 1999 through March 1, 2001.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       July <u>19</u>, 2006
             Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      July 19, 2006
                  Buffalo, New York